## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ANTONIO DANTE CALLAWAY,**

      **Petitioner,**

**v.**                             **Case No. 8:20-cv-561-MSS-CPT**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

      **Respondent.**

_____/

## O R D E R

Callaway petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for first-degree murder and attempted robbery. (Doc. 1 at 1) After reviewing the petition (Doc. 1), the response (Doc. 10), and the appendix containing the relevant state court record (Doc. 11), the Court **DENIES** the petition.

### PROCEDURAL HISTORY

A jury found Callaway guilty of first-degree murder and attempted robbery. (Doc. 11-2 at 126–27) The trial court sentenced Callaway to life in prison for the murder conviction and a concurrent twenty-five years for the attempted robbery conviction. (Doc. 11-2 at 140–47) Callaway appealed, and the state appellate court affirmed. (Doc. 11-4 at 74)

Callaway filed a petition alleging ineffective assistance of appellate counsel (Doc. 11-4 at 78–86), and the state appellate court denied relief. (Doc. 11-4 at 91) He moved for post-conviction relief (Doc. 11-4 at 105–75), the post-conviction court denied relief without an evidentiary hearing (Doc. 11-4 at 176–79), and the state appellate court affirmed. (Doc. 11-5 at 75) Callaway's federal petition follows.

1

## FACTS

On November 11, 2012, Chamira Brown drove Callaway, Ethan Lucas, and Jalesa Dixon to a flea market. (Doc. 11-3 at 381–83) While riding in the car, Callaway asked Lucas if he could borrow Lucas's mobile telephone but Lucas's telephone did not work. (Doc. 11-3 at 383–84) Dixon offered Callaway her telephone, but Callaway declined because he was "trying to come across a lick." (Doc. 11-3 at 384) Dixon understood a "lick" to mean a scam or a robbery. (Doc. 11-3 at 384, 494, 512) Callaway asked Dixon if she knew Andrea Barnett and described Barnett as an overweight female with dreadlocks who wore a silver necklace with three stars and went to their high school. (Doc. 11-3 at 387–88) Dixon had seen a girl who wore that necklace but did not know her name. (Doc. 11-3 at 388) Dixon thought that Callaway and Lucas intended to rob Barnett. (Doc. 11-3 at 389)

During the ride to the flea market, Brown asked Callaway and Lucas for money for gasoline. (Doc. 11-3 at 389–90, 404–05) Callaway and Lucas pawned jewelry at the flea market and gave Brown five or ten dollars. (Doc. 11-3 at 405–06) Callaway and Lucas told Brown that they would give her more money the next day because they "got a lick set up." (Doc. 11-3 at 406–08)

The next day, on November 12, 2012, a friend picked up Barnett from her home to drive her to school. (Doc. 11-3 at 199–200, 239–40) Barnett asked her friend to drop her off a short distance before they arrived at school. (Doc. 11-3 at 241–42) Barnett exited the car, crossed the street, and walked towards a trail. (Doc. 11-3 at 242)

Terrell Eaton, who knew Callaway and his family for twenty years, rode his bicycle to work that morning, saw a male standing on the trail, saw a young, tall, overweight female walking towards the trail, and saw Callaway at a bridge right next to the trail. (Doc. 11-3 at

69–76, 92) About fifteen minutes after seeing Callaway, Eaton heard "crackle pop" sounds. (Doc. 11-3 at 77–78, 86, 89–91) A detective showed Eaton a photograph of Barnett, and Eaton identified Barnett as the female he saw walking towards the trail. (Doc. 11-3 at 111)

A neighbor, who lived close to the trail, was standing on her porch, heard gunshots, and saw two males running away from the bridge. (Doc. 11-3 at 172–76) A second neighbor, who lived close to the trail, heard the gunshots, and saw Callaway, a male named Chris Forrester, and a third male she could not identify outside her bedroom window ten minutes later. (Doc. 11-3 at 121–26, 563) The second neighbor knew Callaway by his nickname, "Dunt" and recognized Callaway because her cousin was Callaway's friend. (Doc. 11-3 at 124, 126) Sherrick Forrester, Chris Forrester's older brother, lived close to the trail, heard the gunshots while he was lifting weights with Chris, and saw Callaway and Lucas fifteen minutes later. (Doc. 11-3 at 160–61) Because the Forrester brothers heard the gunshots and saw helicopters flying in the air, they told Callaway and Lucas to leave. (Doc. 11-3 at 162)

A school resource officer found Barnett unresponsive with gunshot wounds in her stomach. (Doc. 11-3 at 215, 221–22, 248–51) A crime scene technician found fifty-five grams of marijuana in Barnett's purse. (Doc. 11-3 at 17, 20, 373) Barnett was wearing the necklace with the star pendant. (Doc. 11-3 at 48, 202) A medical examiner conducted an autopsy of Barnett and identified three fatal gunshot wounds and a fourth non-fatal gunshot wound. (Doc. 11-3 at 335–37) A firearm analyst examined bullets collected from the autopsy and cartridges collected from the crime scene and opined that one 0.32-caliber firearm fired two bullets and a second 0.38-caliber firearm fired four bullets. (Doc. 11-3 at 282–86)

Records from a mobile telephone service provider showed text messages from someone named "Dunt," Callaway's nickname, to Barnett's mobile telephone on November

11, 2012, the day before the shooting. (Doc. 11-3 at 483, 489) A narcotics police officer opined that the sender and the recipient of the text messages used code words to arrange a sale of marijuana. (Doc. 11-3 at 497–99) Cell site data showed Lucas's mobile telephone near the crime scene at the time of the shooting. (Doc. 11-3 at 546, 549–52, 569–71)

YSTR DNA from a swab of a baseball hat collected from the crime scene contained a mixture of at least two individuals that could match Ethan Lucas or his male relative. (Doc. 11-3 at 362) One in every 1,156 males in the general population could have contributed to the mixture. (Doc. 11-3 at 362) YSTR DNA from a second swab of the hat contained a mixture of at least three individuals and a major profile that matched Lucas or his male relative. (Doc. 11-3 at 362) One in every 6,249 males in the general population could have contributed to the mixture. (Doc. 11-3 at 363) A DNA analyst excluded Callaway's DNA from the first swab and could neither include nor exclude his DNA from the second swab. (Doc. 11-3 at 364–65)

On November 12, 2012, after waiving his constitutional rights, Callaway told a detective that he spent the night at Lucas's home the evening before and returned to his own home that morning at 5:30 A.M. (Doc. 11-3 at 505–07) Callaway claimed that he intended to go to school but did not attend because his stomach was upset and said that he returned to Lucas's home at 7:10 A.M. (Doc. 11-3 at 506–09) Callaway claimed that he and Lucas remained at Lucas's home for the rest of the day. (Doc. 11-3 at 509–10) Callaway admitted that he knew Barnett and often spent time with her but denied recently communicating with her. (Doc. 11-3 at 510)

Lucas's mother testified that Callaway spent the night at her home on November 11, 2012. (Doc. 11-3 at 142–43, 446) The following morning, Lucas's mother dropped Callaway

off near where he lived so that he could attend school. (Doc. 11-3 at 143) She confirmed that Lucas and Callaway were good friends. (Doc. 11-3 at 141–42)

During the defense case-in-chief, Callaway's girlfriend testified that she spent the night with Callaway at Lucas's home on November 11, 2012. (Doc. 11-3 at 592–93) His girlfriend denied that Callaway and Lucas were close friends who spent a lot of time together. (Doc. 11-3 at 592–93) A detective testified that the neighborhood where Callaway lived was three or four hundred feet from the crime scene. (Doc. 11-3 at 599) The detective searched a garage converted into an apartment where Callaway stayed and found no evidence related to the murder. (Doc. 11-3 at 599–600)

## STANDARDS OF REVIEW

**AEDPA**

Because Callaway filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Callaway asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial,
a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 691. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas

proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

In a decision without a written opinion, the state appellate court affirmed the order denying Callaway post-conviction relief. (Doc. 11-5 at 75) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Because the post-conviction court provided reasons for denying Callaway's claims in a written order (Doc. 11-4 at 176–79), this Court evaluates those reasons under Section 2254(d).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court denies the claim as procedurally barred. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

Also, "a state court's rejection of a federal constitutional claim on procedural grounds will [ ] preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citing *Coleman*, 501 U.S. at 729–30). A state court's procedural ruling rests on an independent and adequate state ground if (1) the last state court rendering a judgment in the case clearly and expressly relies on a state procedural rule to resolve the federal claim without reaching the merits of the claim, (2) the state court's decision rests solidly on state law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion," or in a "manifestly unfair" manner. *Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494, 1516–17 (11th Cir. 1990)).

To excuse a procedural bar on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

### Ground One

Callaway asserts that trial counsel was ineffective for not moving to dismiss the indictment. (Doc. 1 at 15) He contends that the indictment, which charged first-degree murder, failed to allege premeditation. (Doc. 1 at 15) The post-conviction court denied the claim as follows (Doc. 11-4 at 177) (state court record citations omitted):

> [Defendant] alleges ineffective assistance of counsel for failing "to properly object or move to dismiss the fatally defective indictment filed by the State in the present case." Specifically, the Defendant alleges trial counsel should have challenged the

indictment as it failed to allege the murder was perpetrated with premeditation.

. . .

The indictment charged the Defendant with having committed first-degree felony murder. "It is well established that the commission of a homicide in conjunction with the intent to commit a felony supplants the premeditation or malice aforethought classically required in a first-degree murder prosecution." *De Loach v. State*, 388 So. 2d 31 (Fla. 3d DCA 1980). Trial counsel would have no grounds to have objected for the lack of alleging premeditation.

Whether the indictment adequately alleged first-degree murder is an issue of state law, and a state court's determination of state law receives deference in federal court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.").

The indictment alleged that Callaway committed first-degree felony murder as follows (Doc. 11-2 at 30) (bolding added):

The Grand Jurors of the State of Florida, empaneled and sworn to inquire and true presentment make in and for the County of Polk and State of Florida, upon their oath do present that ANTONIO DONTE CALLAWAY on the 12th day of November, Two Thousand and Twelve, in the County and State aforesaid, **while engaged in the perpetration of or the attempt to perpetrate a robbery, unlawfully did kill a human being, to wit: Alicia D. Barnett**, by shooting the said Alicia D. Barnett with a firearm, and during the commission of said offense the said ANTONIO DONTE CALLAWAY discharged a firearm and as a result of said discharge, death or great bodily harm was inflicted upon Alicia D. Barnett in violation of Sections 782.04, 777.011, and 775.087, Florida Statutes, contrary to the form of the Statutes, in such cases made and provided and against the peace and dignity of the State of Florida.

The elements of first-degree felony murder are: (1) the victim is dead, (2) the defendant caused the death of the victim while engaged in the commission of a felony or

the attempt to commit a felony, and (3) the defendant was the person who actually killed the victim. Fla. Std. (Crim.) Jury Instr. 7.3; § 782.04(1)(a)(2), Fla. Stat. ("The unlawful killing of a human being . . . [w]hen committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any [enumerated felony] is murder in the first degree and constitutes a capital felony, punishable as provided in section 775.082.").

In order to prove first-degree felony murder the state need not prove premeditation or a specific intent to kill but must prove that the accused entertained the mental element required to convict on the underlying felony." *Gurganus v. State*, 451 So. 2d 817, 822 (Fla. 1984). "[P]remeditation is 'presumed by law from the accused's perpetration of a violent felony. In such a case, the offense remains premeditated murder; only an element of it is deemed proven by evidence of the accused's felonious conduct.'" *Vasil v. State*, 374 So. 2d 465, 467 (Fla. 1979) (citation omitted).

Because the indictment alleged each element of first-degree felony murder and tracked the language of the statute for the crime, a motion to dismiss would not have succeeded, and the post-conviction court did not unreasonably deny the claim. *Meders v. Warden, Ga. Diag. Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained."); *Lightbourne v. State*, 438 So. 2d 380, 384 (Fla. 1983) ("The instant indictment tracked the statute and adequately placed the defendant on notice that he was charged with first-degree murder resulting from any one or a combination of the three specific methods in the indictment.").

Ground One is **DENIED**.

**Ground Two**

Callaway asserts that the prosecutor violated his federal rights by failing to allege in the indictment that Callaway committed the murder with premeditation. (Doc. 1 at 16) He contends that the indictment failed to allege a crime. (Doc. 1 at 16)

The Respondent asserts that the claim is procedurally defaulted because Callaway failed to present the claim before trial and on direct appeal. (Doc. 10 at 14–17) *See* Fla. R. Crim. P. 3.850 ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Callaway presented the claim in his motion for post-conviction relief (Doc. 11-4 at 113–15), and the post-conviction court denied the claim on the merits. (Doc. 11-4 at 177) Also, Callaway presented the claim in his brief on post-conviction appeal (Doc. 11-5 at 60–61), and the state appellate court summarily affirmed without a written opinion. (Doc. 11-5 at 75) On post-conviction appeal, the State of Florida did not alert the state appellate court to the procedural bar. (Doc. 11-5 at 72) This Court presumes that the state appellate court reviewed the merits of the claim. *Wilson*, 138 S. Ct. at 1192. Consequently, Callaway is entitled to a review of the merits of his claim on federal habeas. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available.").

The post-conviction court denied the claim as follows (Doc. 11-4 at 177):

> Defendant's [ ] claim alleges that the trial court lacked jurisdiction to enter the judgment or impose a sentence, as a direct result of the allegedly defective indictment. This claim is based upon the same flawed reasoning as [the claim] above, and for the reasons stated therein, [this claim] is denied.

The post-conviction court refers to the ruling on the claim that Callaway presents in Ground One of his federal petition.

"'The sufficiency of a state indictment is an issue on federal habeas corpus only if the indictment was so deficient that the convicting court was deprived of jurisdiction.'" *Sneed v. Fla. Dep't Corrs.*, 496 F. App'x 20, 23 (11th Cir. 2012) (quoting *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir. 1989)). The indictment in Callaway's case alleged each element of first-degree felony murder and tracked the language in the statute. (Doc. 11-2 at 30) Fla. Std. (Crim.) Jury Instr. 7.3; § 782.04(1)(a)(2), Fla. Stat. The indictment further identified the county where the defendant committed the crime, the date when the defendant committed the crime, the underlying felony that the defendant engaged in when he killed the victim, the name of the victim, and the type of weapon that the defendant used to kill the victim. (Doc. 11-2 at 30) These allegations supported the trial court's jurisdiction over the felony prosecution in Polk County, Florida. § 26.012(2)(d), Fla. Stat. ("Circuit courts shall have exclusive original jurisdiction: Of all felonies and of all misdemeanors arising out of the same circumstances as a felony which is also charged . . . .").

Because the indictment was not "so deficient that the convicting court was deprived of jurisdiction," the post-conviction court did not unreasonably deny the claim. *Heath*, 863 F.2d at 821. *Hamling v. United States*, 418 U.S. 87, 117 (1974) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'") (citation omitted). *DeBenedictis v. Wainwright*, 674 F.2d 841, 842 (11th Cir. 1982) ("Examination of the Information upon which petitioners were charged and prosecuted reveals that it

adequately incorporates the elements of grand larceny by fraudulent misrepresentation in the language of each count.").

Ground Two is **DENIED**.

**Ground Three**

Callaway asserts that the circumstantial evidence presented by the prosecutor at trial failed to prove his guilt ("Trial Claim"), and trial counsel was ineffective for not moving for a judgment of acquittal. ("Ineffective Assistance of Counsel Claim") (Doc. 1 at 17)

**Trial Claim**

Callaway asserts that the circumstantial evidence presented by the prosecutor at trial failed to prove his guilt. (Doc. 1 at 17) The Respondent asserts that the claim is procedurally defaulted because the post-conviction court denied the claim on an independent and adequate state ground. (Doc. 10 at 20–21) The post-conviction court denied the claim as follows (Doc. 11-4 at 178) (state court record citations omitted):

> [Defendant] alleges the "conviction [was] obtained in violation [ ] of the Defendant's constitutional rights to proper due process where it is readily apparent that the jury's verdict is contrary to the law and weight of the evidence in this case." This claim is merely a challenge to the sufficiency of the evidence presented at trial. Fla. R. Crim. P. 3.850(c) states: "[t]his rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence." This claim is not cognizable pursuant to rule 3.850. *See also Childers v. State*, 782 So. 2d 946 (Fla. 4th DCA 2001); *Rasheed v. State*, 449 So. 2d 981 (Fla. 1st DCA 1984).

Because "the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds," the claim is procedurally defaulted on federal habeas. *LeCroy v. Sec'y, Fla. Dep't Corrs.*, 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) (citing *Whiddon v. Dugger*, 894 F.2d 1266, 1267–68 (11th Cir. 1990)). Also, even though trial counsel moved for a

judgment of acquittal at trial and argued that the circumstantial evidence did not prove his guilt (Doc. 11-3 at 582–83, 607), Callaway did not assert on direct appeal that the lack of competent, substantial evidence proving his guilt at trial violated his federal right to due process. (Doc. 11-4 at 33–46) If Callaway returned to state court to present the claim, the post-conviction court would deny the claim as procedurally barred. Fla. R. Crim. P. 3.850(c). Consequently, the claim is procedurally defaulted on federal habeas. *Snowden*, 135 F.3d at 736. Because Callaway fails to demonstrate that either cause and prejudice or a miscarriage of justice excuses the procedural default, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

**Ineffective Assistance of Counsel Claim**

Callaway asserts that trial counsel was ineffective for not moving for a judgment of acquittal. (Doc. 1 at 17) He contends that the only evidence that proved his guilt was his statement that he intended to commit a "lick." (Doc. 1 at 17) The post-conviction court denied the claim as follows (Doc. 11-4 at 178–79) (state court record citations omitted):

> [Defendant] alleges trial counsel was ineffective for failing to file an adequate motion for judgment of acquittal. The Defendant avers trial counsel failed to move for a judgment of acquittal "based on the insufficient proof of the elements with the underlying felony for count one and two." Defendant further asserts there was no evidence that he attempted to rob the victim. Defendant's claim lacks specifics as to what trial counsel should have argued. However, trial counsel did in fact make the very arguments the Defendant now advances trial counsel failed to make. Trial counsel stated the evidence was insufficient to show the Defendant was committing a robbery and that the evidence only established he was near the crime scene. The State summarized facts presented at trial which established [that] the evidence show[ed that] the Defendant committed the crimes alleged. The Court then ruled providing the evidence it found establish[ing] each element. The Defendant does not allege any argument trial counsel failed to make which would have changed this ruling.

At the end of the prosecution's case-in-chief, trial counsel moved for judgment of acquittal as follows (Doc. 11-3 at 582–83):

> [Trial counsel:]    Yes, Judge. Judge, as to murder in the first degree, the defense would ask the court to enter a judgment of acquittal as to the State's . . . charge that Alicia Barnett was killed as a consequence of [ ] trying — or while Antonio Donte Callaway was attempting to commit a robbery. [W]e would assert to the court that the evidence as to Mr. Callaway in terms of actually committing a robbery is not enough and not sufficient for this court to send it to the jury. The testimony and evidence [are] that he was near the bridge — being near the bridge. It is not suspicious, as Mr. Callaway lived in Carefree Cove, and that is a place where it is expected that he would be. The State's alternative [theory] was that Ms. Barnett was killed by a person other than — I'm sorry, killed by a person other than Antonio Callaway and that he [was] a principal in the commission of the attempted robbery. [W]e would also assert that the connection as to another person killing Ms. Barnett and the — and the act of Mr. Callaway being a principal is conjecture and that sufficient proof has not been elicited.

The trial court denied the motion after determining that the evidence sufficiently proved Callaway's guilt (Doc. 11-3 at 586–89):

> [Trial court:]    All right. The court does find that the State has at this time, at the very least, laid out a prima facie case as to both counts, felony murder in the first degree, and also attempted armed robbery. The State has, in the light most favorable to the State, presented at least a prima facie case as to the elements of [the] crimes in order for . . . this matter to go on to the jury.

16

Specifically, as to the murder in the first degree as to whether Mr. Callaway was the person that actually killed Alicia Barnett, I have heard evidence that he had a motivation to do it just [ ] days before. We have heard witnesses under oath that testified that he talked about doing a lick, the lick being a robbery, saying that the person — the victim of the lick was a heavy-set girl who had dreads. He told the people allegedly that they knew her as Alicia. There has also been testimony that the morning of the robbery he was seen within five or ten feet of where her body ultimately lay, just a couple of minutes before gunshots rang out. There was also testimony that he was seen running shortly after the gunshots through the neighborhood. Ms. Haynes testified to that, that she saw him running and essentially coming to a stop just outside her window. There has been testimony that he denied being at the scene, but clearly the cell phone evidence puts him close to the scene.

Furthermore, regarding the principal theory, that the State is also pursuing, I have heard testimony that Ethan Lucas and Mr. Callaway in the backseat of the car, while riding around with some of the witnesses [who] testified, both talked about doing a lick on Alicia. They both had motive to rob her.

Furthermore, there was testimony that there [was] a hat at the scene that was recovered, a New Jersey Devils hat, that puts Mr. Lucas potentially at the scene. His DNA is the DNA from the hat, [it] is inclusive of Mr. Lucas. There was also testimony that there was another male along with — from Mr. Eaton. Mr. Eaton testified there was another male at the scene or close to the scene, [whom] he was

17

not able to make out, but only that a male and the defendant and Ms. Barnett were present at the scene. The New Jersey Devils hat has DNA inclusive of Ethan Lucas. And both Mr. Lucas and the defendant had motivation in this matter.

The State has shown motive, as this was a robbery, and they had talked about committing a robbery the day before. Once again, shortly before — just a couple minutes before shots rang out, an unidentified male, the defendant, and the victim were seen within close proximity, specifically the defendant was close to both the unidentified male and also the victim, and ultimately he was seen running from the scene. So the State has, in the light most favorable to the State, laid a prima facie case under both theories as to circumstantially [ ] killing the victim, and also under the principal theory, in particular, as far as furthering the commission of a crime, there is a cell phone in evidence, that Mr. Callaway, going under the nickname of Dunt, lured the victim to the scene, ultimately to rob her, and ultimately where she died.

So, [viewing the evidence in] the light most favorable to the State, the court is going to deny the defense's motion for judgment of acquittal at this time as to all counts, and the matter will proceed to the jury.

At the end of the defense's case-in-chief, trial counsel renewed the motion for judgment of acquittal (Doc. 11-3 at 607), and the trial court denied the renewed motion as follows (Doc. 11-3 at 608–10):

[Trial court:]     All right. The court maintains based on its earlier reasons that it put on the record that the State has shown a prima facie case in the light most favorable to the State as

far as first-degree felony murder is concerned, and also as to attempted robbery. They have shown in [the] light most favorable to the State that Alicia Barnett is deceased. They have also [ ] shown that this was done during the attempted commission of a robbery. There has been testimony that both Mr. Lucas and Mr. Callaway stated that they were going to do a lick on Alicia the following day, that would have been Sunday, they were going to do it Monday, that it was Alicia Barnett. And also there has been testimony — there has been at least circumstantial evidence that the defendant is the person that actually committed the homicide. The circumstantial evidence being that he was seen within five or ten feet of where the body ultimately laid. Just a couple minutes before gunshot rang out, he was seen running very shortly thereafter. He was also on a cell phone — evidence that shows that he — in the light most favorable to the State — lured Ms. Barnett to the scene in order to do a drug transaction, presumably to rob her of her drugs. The State has shown that there is circumstantial evidence that he committed the homicide.

Also, the alternative theory is the principal theory. There was testimony that Ethan Lucas also talked about doing the lick on Alicia, the robbery. There has been testimony that there was an unknown male seen on the bike path about the same time Mr. Callaway was seen on the bike path within feet of where the victim ultimately lay, minutes before gunshots rang out. A ball [ ] cap — a New Jersey Devils ball cap was found at the scene, [which contained] DNA [ ] inclusive of Mr. Lucas. And under the principal theory in the light most favorable to the State, [an] argument can be made that it was Mr. Callaway that lured her to the scene via

19

> text messaging. So in the light most favorable to the State, the State has shown the necessary elements [ ] that the defendant actually committed the homicide or that he was a principal to it.
>
> As far as the robbery is concerned, there has been testimony that they were there to attempt a robbery, that [ ] a lick was going to be done the following day. There was testimony that Ms. Barnett was carrying [ ] about two [ounces] of cannabis with a street value of anywhere from — I believe it was per ounce, $200.00 to $500.00. There has been testimony she had approximately two ounces on her. There has also been testimony that the defendant lured her to the scene via text messaging in order to consummate the drug transaction. There has also been testimony that he was going to do a lick on Alicia the following day. So in the light most favorable to the State, that State has, likewise, shown the elements to attempted robbery.

Because the record refutes the claim that trial counsel was ineffective for not moving for a judgment of acquittal and an expanded motion for judgment of acquittal would not have succeeded, the post-conviction court did not unreasonably apply *Strickland*. *Meders*, 911 F.3d at 1354. *Reynolds v. State*, 934 So. 2d 1128, 1145 (Fla. 2006) ("In moving for a judgment of acquittal, a defendant 'admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.'") (citation omitted); *Chamberlain v. State*, 881 So. 2d 1087, 1104 (Fla. 2004) ("'Where there is room for a difference of opinion between reasonable men as to the proof of facts from which the ultimate fact is sought to be established, or where there is room for such differences as to the inference which might be

drawn from conceded facts, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge.'") (citation omitted).

Ground Three is **DENIED**.

**Ground Four**

Callaway asserts that the prosecutor violated his federal rights by presenting false testimony at trial. (Doc. 1 at 18) The Respondent asserts that the claim is procedurally defaulted because Callaway failed to cite *Giglio v. United States*, 405 U.S. 150 (1972) or other federal authority in his motion for post-conviction relief. (Doc. 10 at 21–24) In his motion, Callaway asserted that "his conviction was illegally obtained from the perjured statements and testimony of the State's two [ ] key witnesses against him in this case." (Doc. 11-4 at 119) *Giglio* applies to a false testimony claim in a Florida court, and a *Giglio* claim is cognizable in a motion for post-conviction relief. *Jimenez v. State*, 265 So. 3d 462, 479 (Fla. 2018). *Robinson v. State*, 65 So. 3d 75, 76 (Fla. 2d DCA 2011) ("Although such a claim is occasionally made on direct appeal, a *Giglio* violation is typically raised in a postconviction motion because these violations are usually discovered after the trial is over.") (citations and footnotes omitted).

The post-conviction court denied the claim as follows (Doc. 11-4 at 178) (state court record citations omitted):

> [Defendant] alleges his conviction was ". . . obtained by perjured statements and testimony of the State's key witnesses against Defendant in this case." The Defendant alleges [that] a detective conspired with Chamira Brown to falsely implicate the Defendant in this case, and further that Ms. Brown had motive to lie to deflect law enforcement investigation from another individual, and for reward money offered by Crime Stoppers. The Defendant attaches excerpts of transcripts from

an interview between detectives and Ms. Brown, and Ms. Brown's testimony at trial. None of the transcripts attached, nor the Defendant's claim, actually asserts any perjured statement was made. Rather, the Defendant merely alleges Ms. Brown had motive to fabricate her statement and testimony. The Defendant further claims the jury would have reached a different verdict had they been presented [with] this information, but as the excerpts of the transcript show, trial counsel did cross-examine Ms. Brown as to these facts, and they were therefore known to the jury.

"'[I]n order to prevail on a *Giglio* claim, a petitioner must establish [1] that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony, and [2] that the falsehood was material.'" *Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 949 (11th Cir. 2016) (quoting *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1277 (11th Cir. 2005)). "A falsehood is material if there is 'any reasonable likelihood' that it could have affected the result." *Raleigh*, 827 F.3d at 949.

Detective Tommy Ray and Sergeant Mitch Meadows interviewed Brown. (Doc. 11-4 at 133) The prosecutor did not present false testimony by either the detective or the sergeant because neither testified at trial. (Docs. 11-2 at 155–63)

At trial, on cross-examination, Chamira Brown admitted that she spoke with the detective and the sergeant about the crime because she expected to receive money from Crime Stoppers (Doc. 11-4 at 141–42):

| [Trial counsel:] | Now, Ms. Brown, when you initially talked to the police, you just really didn't cooperate with them at all, right? |
| --- | --- |
| [Brown:] | No, ma'am. |
| [Trial counsel:] | Okay. And later on, you decided to cooperate with them for a couple of reasons, right? |
| [Brown:] | Yes, ma'am. |

22

[Trial counsel:]    One of those reasons was that you were expecting perhaps to get some money from Crime Stoppers?

[Brown:]    That's what they said, but, sure, yes, ma'am.

[Trial counsel:]    And the police were looking — in your mind, you thought the police were looking at somebody that was close to you as a suspect for the case, right?

[Brown:]    Yes, ma'am.

[Trial counsel:]    And who was that?

[Brown:]    Chris Forrester.

[Trial counsel:]    So you wanted them to focus their attention somewhere else rather than to Chris Forrester, is that right?

[Brown:]    Yes, ma'am.

[Trial counsel:]    And you were close to Chris?

[Brown:]    Yeah, I was close to Chris, like I was close to the rest of them.

[Trial counsel:]    Well, you said that you knew Ethan and you knew Mr. Callaway and you have known them a long time, but didn't you describe your closeness to Chris Forrester as —

[Brown:]    Something like a brother.

[Trial counsel:]    Yeah, something like a brother.

[Brown:]    Yes, I did.

[Trial counsel:]    Okay. So you didn't want to police to continue their focus on Mr. Forrester, is that right?

| | |
|---|---|
| [Brown:] | Yes, ma'am. |
| [Trial counsel:] | And that's why a month and a half later you talked to them? |
| [Brown:] | Yes, ma'am. |
| [Trial counsel:] | And you were, of course, hoping to get reward money? |
| [Brown:] | Yes, ma'am. |

On re-direct examination, Brown testified that she never received any money from Crime Stoppers. (Doc. 11-4 at 143)

To support his *Giglio* claim, Callaway attached to his motion for post-conviction relief a transcript of an interview by detectives of Brown. (Doc. 11-4 at 133–37) The transcript shows that the detectives promised Brown that she could remain anonymous and receive money from Crime Stoppers if the information that she provided proved truthful. (Doc. 11-4 at 134–137) During the interview, Brown denied that Christopher Forrester participated in the crime. (Doc. 11-4 at 135) At the end of the interview, the detectives gave Brown the telephone number for Crime Stoppers. (Doc. 11-4 at 136–37) Callaway presented no evidence that Brown received money from Crime Stoppers.

Because Brown accurately testified at trial that she spoke to the detectives because she wanted to receive money from Crime Stoppers and wanted to divert the detective's investigation away from Forrester (Doc. 11-4 at 141–42), and trial counsel cross-examined Brown concerning her bias, the post-conviction court did not unreasonably apply *Giglio*. *Smith v. Sec'y, Dep't Corrs.*, 572 F.3d 1327, 1335 (11th Cir. 2009) ("Accurate statements do not violate the *Giglio* rule."); *Maharaj v. Sec'y, Dep't Corrs.*, 432 F.3d 1292, 1314 (11th Cir. 2005) ("[E]ven if Maharaj had established that Butler's testimony was false (which he did

not), the falsehood was not material. Butler was thoroughly and vigorously cross-examined about the inconsistencies in his accounts, and Maharaj's counsel elicited testimony from Butler that he had lied under oath.").

Ground Four is **DENIED**.

Accordingly, it is **ORDERED** that Callaway's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Callaway and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Callaway neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on March 22, 2023.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE